**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| COMSCORE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:11-CV-290-LMB-TRJ |
| | ) |
| THE NIELSEN COMPANY (US), LLC, | ) JURY TRIAL REQUESTED |
| and NETRATINGS, LLC d/b/a | ) |
| NIELSEN ONLINE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMSCORE'S MEMROANDUM OF LAW IN SUPPORT OF ITS MOTION TO**
**EXCLUDE CERTAIN OPINIONS OF MR. BRETT REED**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 1

    A.    Identifying the individual user is central to the business of online audience measurement ........................................................................................................ 2

    B.    comScore led the industry by establishing a large panel and passively collecting information from its panelists .................................................................. 3

    C.    Nielsen transitions to a large panel and to a passive user identification system .................................................................................................................. 4

    D.    Nielsen's Expert Reports Submitted Regarding Damages .................................... 5

LEGAL STANDARD.......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

I.    Mr. Reed's Opinions Concerning Non-Infringing Alternatives Are Unreliable and Should Be Excluded........................................................................................................ 8

    A.    There is no evidence that Nielsen could modify the NetSight system and produce commercially acceptable results .............................................................. 9

    B.    There is no evidence that user prompting alone is an acceptable alternative to the patents-in-suit............................................................................................ 12

II.    Mr. Reed's Opinions Regarding A Reasonable Royalty For Nielsen's Infringing Conduct Must Be Excluded Because His Overall Methodology Is Unreliable ................ 14

CONCLUSION.................................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993).................................................................................. *passim*

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970)......................................................... *passim*

*Grain Processing Corp. v. American Maize-Products, Co.*,
    185 F.3d 1341 (Fed. Cir. 1999)......................................................................9

*King-Indiana Forge, Inc. v. Millennium Forge, Inc.*,
    2009 WL 3187685 (S.D. Ind. Sept. 29, 2009) ..........................................10

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)........................................................................................6

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 (Fed. Cir. 2008)....................................................................16

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) .....................................................................11

*Pugh v. Louisville Ladder, Inc.*,
    361 Fed. App'x 448 (4th Cir. 2010) ..............................................................7

*Rolls-Royce PLC v. United Tech. Corp.*,
    Case No. 1:10cv457, 2011 WL 1740143 (E.D. Va. May 4, 2011)...............9

*SRI Int'l Inc. v. Internet Security Sys.*, Inc.,
    No. 04-1199 (D. Del. Oct. 31, 2011) .....................................................12, 14

*TWM Mfg. Co. v. Dura Corp.*,
    789 F.2d 895 (Fed. Cir. 1986).................................................................11, 13

*Wehling v. Sandoz Pharma. Corp.*,
    162 F.3d 1158 (4th Cir. 1998) .....................................................................12

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) .........................................................................7

*Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010).................................................................7, 14

*Ziggity Systems, Inc. v. Val Watering Systems,*
   769 F. Supp. 752 (E.D. Pa. 1990) ............................................................................................9


**STATUTES**

35 U.S.C. § 284......................................................................................................................14


**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 26(a)(2) .................................................................................10

Fed. R. Evid. 702 ............................................................................................................ *passim*

Local Rule 26(D) .................................................................................................................11

**INTRODUCTION**

Damages in this case concern the value of comScore's patented technologies related to building large online consumer panels and providing granular demographic information from those panels.  Nielsen has used those technologies in order to compete with comScore in the market for online audience measurement products.  In an effort to diminish that value, Nielsen's damages expert, Brett Reed, relies on theoretical noninfringing alternatives for which there is no evidence of commercial acceptability.  Because Rule 702 requires more than speculation and *ipse dixit* assertions, comScore moves to preclude Mr. Reed from offering any opinions that rely on the unsupported opinion that Nielsen could have modified its NetSight system to not infringe and remain commercially viable.

In addition, Mr. Reed's opinions concerning what constitutes a reasonable royalty are unreliable due to his failure to apply *Georgia-Pacific* analysis properly in this case.  Rather than providing actual analysis of the *Georgia-Pacific* factors for determining a reasonable royalty rate, Mr. Reed criticizes comScore's damages expert's analysis, injects extraneous and unsupported statements regarding other factors he believes limit a reasonable royalty, and arrives at an opinion on damages that splits "cost savings" between the parties rather than awarding a royalty for Nielsen's use of patents-at-issue.  Mr. Reed's departure from the well-established *Georgia-Pacific* methodology independently warrants the exclusion of his opinions regarding what the outcome of a hypothetical negotiation between the parties would be.

**BACKGROUND**

Nielsen and comScore are fierce competitors in the online market research industry.  Both companies operate large consumer panels to collect information concerning online consumer behavior.  This information is processed, analyzed, and sold to customers in the form of various market research reports.  This case concerns technologies that enable those

market research reports to contains detailed demographic reporting.  Because these market

research products are the commercial output of the accused technology, the parties experts are in

complete agreement that an appropriate royalty base are those revenues from the market research

reports derived from the operation and measurement of Nielsen's online panel.  Forrest Decl.,

Ex. A at 121:19–122:6.

> **A.**     **Identifying the individual user is central to the business of online audience measurement.**

Nielsen and comScore both collect an enormous amount of data from online

consumer panels in order to understand and report on consumer behavior online.  Among other

things, companies use these reports to better understand how consumers respond to a company's

online presence and how a company is performing in the market in comparison to its

competitors.  *See* Forrest Decl., Ex. B at 2.

There are three principal methodologies for collecting online consumer behavior

data, including monitoring a panel of users (panel method), surveying a panel of users (survey

method), or gathering usage data from servers (census method).  *See* Forrest Decl., Ex. C.  The

panel and survey methods both depend on participation from large, demographically diverse

bases of individuals to ensure that enough information is collected to be helpful for tracking

online activity.  *See* Forrest Decl., Ex. B at 21, 25.  Survey based approaches have the added

difficulty of ensuring that enough participants adequately respond to the survey questions.  *See*

Forrest Decl., Ex. C.

To collect data with a panel-based approach, a large, demographically

representative panel is necessary to ensure that all demographics are represented, the data is

statistically significant, and that enough information is available to provide in-depth data for

customers.  *Id.*  According to Nielsen, the overall goal for a panel-based methodology is to

ensure that the panel sample actually represents the online population and that the data is unbiased.  *See* Forrest Decl., Ex. D at N-COM00546398.

When collecting data from multiuser households (households where more than one person uses a single computer), it is necessary to have a means to assign sessions between users in a household.  This is because "[i]nternet marketers advertise to people, not to computers . . . ."  Forrest Decl., Ex. E at CSC00278521.  One approach for assigning sessions is active identification, whereby an onscreen prompt asks the user to self-identify during an online session. *See* Forrest Decl., Ex. N at N-COM00941615.  This prompt approach is considered less desirable because it increases panelist incentive costs, increases overall attrition by panelists, and impacts measurement results because it can increase the risk of participation bias and influence user behavior.  *See* Forrest Decl., Ex. F at  N-COM00022955.

A better approach is passive user identification, whereby a user identification occurs, and online sessions are assigned, through observing the user's online activities or interaction with an input device. *See* Forrest Decl., Ex. G at N-COM000267.  Because passive user identification does not intrusively remind panelists that their activities are being monitored, panelists are less likely to leave the panel.  In addition, passive user identification does not give rise to the same risk of participation bias as the prompt approach.  *Id.*

**B.      comScore led the industry by establishing a large panel and passively collecting information from its panelists.**

comScore's market research report products are based on a number of proprietary databases that analyze and report on internet activity from a panel of approximately two million internet users worldwide.  *See* Forrest Decl. Ex. B at 1.  comScore collects data from these panelists in a manner that allows it to match individual users with otherwise anonymous online sessions.  *See* Forrest Decl., Ex. I at 20:6–25:5.

3

This innovative ability to produce reports from a large worldwide panel with granular demographic statistics set comScore apart from its competitors in the online audience measurement market.  *Id.*  In addition, because comScore's pioneering methodologies are passive and do not require active participation from the panelists, comScore has the benefit of retaining panelists for a longer period of time than if active participation was required.  *Id.*

### C.   Nielsen transitions to a large panel and to a passive user identification system.

Prior to 2007, Nielsen did not provide person-level reporting for its large online panel because it did not have the means to distinguish between individual users of a multiuser household.  *See* Forrest Decl., Ex. J at N-COM00001450-58.  But Nielsen recognized that it needed a large panel and a system for identifying users on that panel in order to meet its customers' demands and to better compete with comScore.  *See* Forrest Decl., Ex. J at N-COM00001451; Forrest Decl., Ex. K at N-COM00052343;

Nielsen's NetSight system collects and processes data from Nielsen's online panel.  Forrest Decl., Ex. M at ¶¶ 29–35.  This system, which is an accused instrumentality in this case, relies on a combination of passive user identification and active identification (prompting) to assign online sessions to individual panelists.  *See* Forrest Decl., Ex. G at N-COM00026732.   The passive user identification aspect of Nielsen's system and methodology, which Nielsen refers to as "Individualization" or "IDV," allows Nielsen to determine which member of a multimember household is using a computer based on data collected from an online session.  *See id.* at N-COM00026714.

Nielsen's IDV process contains eight modules that together generate a score relating to the likely identity of the user for each online session.  Those eight modules are URL Parsing, Demographic, History, Biometric, Biometric Name, Win XP Login, Profile, and

Timestamp.  *Id.* at N-COM00026716.  Each module generates a score for each member of a household.  A member's scores from the modules are then weighted and summed to provide a total score for the member.  The online session is assigned to the member of the household with the highest score.  *Id.*  This passive user identification system thereby allows Nielsen to reduce panelist involvement, incentive costs, biases, and panelist attrition.  *See id.* at N-COM00026715.

Nielsen has marketed its passive user identification system to its biggest customers, including Yahoo and Google.  *See* Forrest Decl., Ex. N; Forrest Decl., Ex. O.  It explained the need for passive user identification as arising from the fact that as much as 30% of its panel would not accept active prompts.  *See* Forrest Decl., Ex. N at N-COM00941647; Forrest Decl., Ex. O at N-COM00936451.  And when it announced the rollout in the United States of its new panel and methodology, Nielsen proudly boasted that it had increased its reporting from 3,000 websites to 30,000 websites.  *See* Forrest Decl., Ex. L.  It also boasted that it now had "the largest panel for online audience measurement in the United States," more than eight times Nielsen's previous sample size. *See id.*

**D.    Nielsen's Expert Reports Submitted Regarding Damages**

Nielsen retained Mr. Brett L. Reed to provide a report on damages on behalf of Nielsen, which is entitled the Rebuttal Expert Report of Brett L. Reed, and dated July 29, 2011.  Forrest Decl., Ex. P (the "Reed Report").  In his report, Mr. Reed purports to "evaluate the potential damages resulting from Nielsen's infringement" of comScore's U.S. Patent Nos. 7,260,837 (the "'837 patent") and 7,930,285 (the "'285 patent") (collectively, the "patents-in-

suit") and to evaluate and comment on the analysis set forth in the Expert Report of Philip Green submitted by comScore to evaluate comScore's damages. *See* Reed Report, at 2.[1]

Mr. Reed opines that a reasonable royalty for infringement of the '837 and '285 patents would be either (1) a fixed quarterly royalty of $100,000 per patent; or (2) a royalty applied to Nielsen's panel-related revenues in the amount of 0.5% for each patent. Reed Report, at 5. Mr. Reed bases this opinion on what he estimates would be the "portion of the panel cost savings from not having to prompt additional panelists or modify the modules that would continue to be used in a non-infringing IDV algorithm." Reed Report, at 60.

## LEGAL STANDARD

Expert witnesses may offer testimony on a variety of subjects if "(1) the testimony is based upon sufficient facts or data; (2) the testimony is a product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The admissibility of such testimony depends on whether that testimony "is sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999).

Neither *Daubert* nor the Federal Rules of Evidence require a court to admit opinion evidence that is connected to existing data only by an expert's unproven assertion. *Kumho Tire Co.*, 256 U.S. at 157. There are two parts to a court's inquiry into the reliability and relevance of expert testimony, and that inquiry focuses on the "principles and methodology" employed by the expert, not the conclusions that the expert ultimately reaches. *Westberry v.*

---

[1] Mr. Reed has also offered a report concerning the commercial success of the patents-in-suit. That report is not the subject of this motion.

*Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quoting *Daubert*, 509 U.S. at 594–95). First, the court must determine whether the expert employed reliable reasoning and methodology. *Westberry*, 178 F.3d at 260. Next the court must determine whether the expert's opinions are relevant to the case. *Id.*

To calculate a reasonable royalty in a patent infringement case, courts recognize three principal methodologies. They are: (1) application of an established royalty rate; (2) profit projections for the infringer's sales; or, (3) a hypothetical negotiation between the parties at the time infringement began based on the factors in *Georgia-Pacific Corp. vs. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). *See Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010). Any analysis under *Georgia-Pacific* factors must comport with the requirements of Rule 702 and should be excluded when "there is 'simply too great an analytical gap between the data and the opinion offered.'" *EPlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 813 (E.D. Va. 2011) (quoting *Pugh v. Louisville Ladder, Inc.*, 361 Fed. App'x 448, 454 n.4 (4th Cir. 2010)). Expert opinion supported only because the expert says it is so, is not sufficiently reliable to be admissible. *See id.* at 812–13 (applying the *Daubert* analysis to expert testimony concerning damages).

## ARGUMENT

1.      Mr. Reed's opinions improperly assume that Nielsen could modify its IDV system, by removing certain modules from its IDV algorithm, to avoid infringement of the '837 and '285 patents. There is, however, no admissible evidence that such theoretical modifications would result in an acceptable alternative. Mr. Reed also assumes that Nielsen could rely solely upon user prompting to assign online sessions, but there is no evidence that such a change in methodology would be a commercially acceptable substitute. Accordingly, any opinions of Mr.

7

Reed that rely upon the availability and acceptability of noninfringing alternatives, including his

determination of a reasonable royalty and certain criticisms of Mr. Green, should be excluded.

2.      Mr. Reed's opinions suffer from a second infirmity, namely, his failure to

apply the *Georgia-Pacific* methodology properly to the facts in this case.  Although Mr. Reed

nominally recites *Georgia-Pacific* factors in his expert report, his ultimate opinions concerning a

reasonable royalty rate bear no relationship to these factors.  Accordingly, Mr. Reed's opinions

concerning a reasonable royalty should also be excluded as unreliable because of his failure to

apply the *Georgia-Pacific* factors properly.

## I.    Mr. Reed's Opinions Concerning Non-Infringing Alternatives Are Unreliable and Should Be Excluded.

A central premise to Mr. Reed's opinions is his assumption that Nielsen has

certain non-infringing alternatives to its use of comScore's patented technology. Thus, he

explains that his analysis is "focused on the benefits obtained by Nielsen from the alleged use of

the patents-in-suit compared to various alternatives available to Nielsen."  Reed Report, at 5.

Mr. Reed points to two "design around options" that he opines are available to Nielsen.  Reed

Report, at 57.  The first of these options, according to Mr. Reed, is that "Nielsen could stop using

the alleged infringing individualization modules" and continue using the remaining IDV

modules.  *Id.*  There is, however, no admissible evidence to support that such a "design around"

is anything more than theoretical.  The second option, according to Mr. Reed, is for Nielsen to

abandon passive user identification altogether and rely on prompting to identify users.  While

this option may be technically feasible for Nielsen, there is no evidence that prompting alone

would be commercially acceptable.

As Nielsen seeks to rely upon the non-infringing alternatives to support Mr.

Reed's damages opinion, Nielsen must demonstrate that those alternatives would be

commercially acceptable. *See Grain Processing Corp. v. American Maize-Prods., Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999). "When an alleged alternative is not on the market during the accounting period, a trial court may reasonably infer that it was not available as a noninfringing substitute at that time." *Id.* Where an infringer seeks to introduce a reasonable royalty opinion that is premised on a noninfringing alternative, the infringer must come forward with more than an "unsubstantiated assumption." *Ziggity Sys., Inc. v. Val Watering Sys.*, 769 F. Supp. 752, 829 (E.D. Pa. 1990). But there is no admissible evidence to support Mr. Reed's conjecture that the two alternatives he has identified were both available and commercially acceptable. Consequently, Mr. Reed's opinions should be excluded as unreliable. *See Rolls-Royce PLC v. United Tech. Corp.*, Case No. 1:10cv457, 2011 WL 1740143, at *7 (E.D. Va. May 4, 2011) (excluding an expert's opinion concerning lost profits where there was no evidence to support the expert's assumptions regarding aftermarket services).

**A.      There is no evidence that Nielsen could modify the NetSight system and produce commercially acceptable results.**

Mr. Reed made clear during his deposition that he is not himself able to opine about the alleged "success rate" of a modified NetSight system. He testified: **"I'm not opining about the 60 percent. I'm referring to Mr. Stackhouse's opinion about it being a 60 percent result. I'm utilizing that input, I'm not providing the input."** Forrest Decl., Ex. A at 251:22–252:8 (emphasis added). Mr. Reed also made clear that he was not aware of any corroborating documentary evidence that supported this opinion either. *See id.* at 245:22–246:17 ("Q. Are you aware of any documents that reflect the fact that those three IDV modules; the timestamp module, the profile module, and Win XP login module would have success rate of approximately 60 percent? A: I think we addressed this a little earlier today. I'm aware of documents that address the accuracy and activity rates and assignment rates for these modules,

9

individually, and also collectively with other groups, but **I'm not aware of a document that identifies the performance of the three of them together.**  And that's precisely why I addressed the issue with Mr. Stackhouse  . . . .") (emphasis added).  Moreover, when asked during his deposition if he had asked Mr. Stackhouse to run any tests to "evaluate his estimation that it would have a success rate of 60 percent," *id.* at 246:18–20,  Mr. Reed responded that he "asked [Mr. Stackhouse] to think about following up on it, see if there's any additional information that would confirm his understanding," *id.* at 247:1–4, but that he Mr. Reed had no further discussions with Mr. Stackhouse, *id.* at 254:2–7.

Mr. Reed explained that Mr. Stackhouse conveyed this opinion to him in a telephone conversation with Mr. Stackhouse and Nielsen's lawyers that lasted between 40 minutes and an hour.  *Id.* at 252:19–253:1.  But Mr. Reed is not aware of any analytical work that Mr. Stackhouse performed to reach his opinion, nor even what "exactly [Mr. Stackhouse] may have looked at or considered."  *Id.* at 254:17–255:11.  Rather, Mr. Reed relied entirely on Mr. Stackhouse's industry experience.  *Id.* at 252:9–14.  "When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded." *King-Ind. Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-00341-SEB-DML, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) (excluding damages expert's opinion in trade secret misappropriate case where that opinion was based solely on an interview with a party's employee).

For the reasons set forth in comScore's Motion in Limine to Exclude Testimony Regarding Modification of Nielsen's NetSight System by Removing Individualization Modules, any testimony from Mr. Stackhouse regarding the ability of Nielsen to design around the patents-in-suit would be expert opinion testimony that is clearly inadmissible.  Nielsen never disclosed

any opinions from Mr. Stackhouse in accordance with Federal Rule of Civil Procedure 26(a)(2)

and Local Rule 26(D).  And Nielsen's trial witness list identifies Mr. Stackhouse as a fact

witness, not an expert witness.  *See* Dkt. No. 106 at 2.  Nielsen should not be permitted to

introduce opinion testimony through Mr. Reed that it would be barred from introducing through

Mr. Stackhouse.

   The only other evidence that Mr. Reed purports to rely on for this "design

around" option is alleged opinion testimony from Nielsen's technical expert Dr. Goldberg.  Mr.

Reed states:  "I understand that Nielsen could also undertake a number of modifications that

have been proposed by Nielsen's technical expert Dr. Goldberg."  Reed Report, at 57 n.105.  Mr.

Reed confirmed at his deposition that he was relying on Dr. Goldberg's opinion that Nielsen

could operate its IDV process with only three modules and that his would be an "acceptable

alternative."  *See* Forrest Decl., Ex. A at 257:18–259:2.  But three days later Dr. Goldberg

distanced himself entirely from any opinion regarding the effectiveness of Nielsen's system if

certain modules were excluded, stating "I don't know, sitting here, which modules you can turn

off and still have reasonable performance in terms of identifying users."  Forrest Decl., Ex. Q at

136:15–137:11.  When asked what the performance of Nielsen's system would be if the URL

parsing module, history module, and demographic module were shut off, Dr. Goldberg quickly

conceded:  "I don't have that information."  *Id.* at 137:13–138:2.  In fact, he went further and

testified that was not even something he was "asked to consider."  *See id.* at 136:3–138:7.  The

"[m]ere existence of a competing device does not make that device an acceptable substitute."

*TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 901 (Fed. Cir. 1986).  Where an alleged substitute

lacks "all beneficial characteristics of the patented device," it can "'hardly be termed a substitute

"acceptable" to the customer who wants those advantages.'" *Id.* (quoting *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1162 (6th Cir. 1978)).

Although the complete lack of any foundation for Mr. Reed's opinion warrants its exclusion, the fact that Mr. Reed himself does not even understand the efficacy of the hypothetical design around only confirms its unreliability. For example, Nielsen's internal documents describe the overall accuracy of its IDV process as achieving 94%. *See* Forrest Decl., Ex. F at N-COM00022972. But when asked to explain how his "60% success rate" related to Nielsen's reported accuracy rates for its IDV system, Mr. Reed was "not sure exactly how it would translate." Forrest Decl., Ex. A at 264:16– 265:7.

As there is no admissible evidence to support Mr. Reed's hypothetical modifications to Nielsen's NetSight system, the opinion fails to meet the threshold standards under Rule 702 and Daubert. *See EPlus, Inc.*, 764 F.Supp.2d at 815 (excluding damage expert's testimony because it was "speculative and not based in sound economic principles"); *SRI Int'l Inc. v. Internet Security Sys.*, Inc., No. 04-1199, at ¶ 5 (D. Del. Oct. 31, 2011) (Forrest Decl., Ex. H) (proffered testimony regarding non-infringing alternatives was "wholly speculative and, consequently, not helpful to the trier of fact"); *see also Wehling v. Sandoz Pharm. Corp.*, 162 F.3d 1158 (Table), 1998 WL 546097, at *5 (4th Cir. 1998) (upholding district court's exclusion of expert testing because "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion").

**B.    There is no evidence that user prompting alone is an acceptable alternative to the patents-in-suit.**

The other purported alternative that Mr. Reed relies upon is his belief that Nielsen could implement prompting for all multiuser households in lieu of the IDV component of its

12

system.  Reed Report, at 12,[2] 58–59.  While prompting is a user identification technique that is technically feasible for Nielsen, there is no evidence to show that a prompted panel would produce commercially acceptable results.  *See TWM Mfg.*, 789 F.2d at 901 ("Mere existence of a competing device does not make that device an acceptable substitute.").

Mr. Reed's belief, that Nielsen could produce a commercially acceptable product entirely through prompting, is unsupported by any citations to documentary support or technical expert opinions.  *See* Reed Report, at 12, 57.  It is quite telling that Nielsen's technical expert, Dr. Goldberg, did not even list prompting as a viable alternative to the patented technologies in his own expert report.  *See* Forrest Decl., Ex. M at ¶¶ 265–68.

When pressed at his deposition about the sample bias that results from prompting, Mr. Reed conceded "[t]here can potentially be a difference in demographics."  Forrest Decl., Ex. A at 242:8–243:8.  He also acknowledged that "the panel measurement crew at Nielsen would have to be addressing that issue, and ultimately make[] sure that they're comfortable with the end results, not reflecting bias."  *Id.*  But neither Mr. Reed nor Nielsen have identified any evidence that Nielsen has a solution to address the biases associated with using only prompts.

Moreover, contradicted testimony from comScore's technical expert, Dr. Bailey, demonstrates that prompting is far from an acceptable alternative.  *See* Forrest Decl., Ex. R at ¶407.  Nielsen's own internal documents corroborate this testimony, *see* Forrest Decl., Ex. G at N-COM00026715, as do Nielsen's marketing claims to its own customers.  *See* Forrest Decl., Ex. N at N-COM00941647 ("We expect about 70% online recruited panelists to accept prompted

---

[2]    Mr. Reed initially suggested that surveys would also be an acceptable alternative.  *See* Reed Report, at 12.  But during his deposition he conceded that his opinion is limited to relying on prompting and a modified IDV process as noninfringing alternatives.  *See* Forrest Decl., Ex. A at 260:4–261:8.

meter.  However, excluding the other 30% of the panelists which did not accept the prompted meter means we are biasing the sample."); Forrest Decl., Ex. O at N-COM00935451 (same).

In the absence of any evidence to support his opinion, Mr. Reed's assertion that Nielsen could resort to prompting is entirely speculative and is not the kind of testimony that will assist the jury in understanding the evidence.  *See, e.g., EPlus, Inc.*, 764 F.Supp.2d at 815. "Indeed, it merely confuses the finder of fact and asks the jury to accept the expert's view merely because it was expressed by the expert."  *Id.*; *see also SRI Int'l Inc. v. Internet Security Sys.*, Inc., No. 04-1199, at ¶ 5 (D. Del. Oct. 31, 2011) (Forrest Decl., Ex. H) (excluding testimony regarding possible design around solutions as "wholly speculative" under Rule 702).

## II. Mr. Reed's Opinions Regarding A Reasonable Royalty For Nielsen's Infringing Conduct Must Be Excluded Because His Overall Methodology Is Unreliable.

A second and independent basis to exclude Mr. Reed's opinions is his failure to apply the *Georgia-Pacific* factors properly to the circumstances of this case.  It is well established that the *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) hypothetical negotiation is an accepted methodology for calculating a reasonable royalty under 35 U.S.C. § 284.  *See Wordtech Sys., Inc.*, 609 F.3d at 1319.  It is not enough under *Daubert*, however, for a damages expert to merely recite the *Georgia-Pacific* factors and then offer an opinion.  *See EPlus, Inc.*, 764 F. Supp. 2d at 815 (excluding a damages expert who failed to explain how the application of the *Georgia-Pacific* factors supported his royalty opinion).

As set forth in detail below, Mr. Reed's purported "analysis" under *Georgia-Pacific* consists of little more than criticisms of Mr. Green's opinions, organized under *Georgia-Pacific* headings.  While Mr. Reed may criticize Mr. Green's analysis and opinions (assuming he

is otherwise qualified to offer expert testimony), those criticisms standing alone do not provide a foundation for opining as to what an alternative reasonable royalty would be.

      1. ***Georgia-Pacific* Factors 1 & 4.**  Mr. Reed first purports to discuss *Georgia-Pacific* factors 1 and 4.  Those factors are:

> (1)  The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

> (4)  The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

*Georgia-Pacific Corp.*, 318 F. Supp. at 1120.  But Mr. Reed fails to provide analysis as to how either factor affects the determination of a reasonable royalty rate.  Reed Report, at 50–51.  Although he does acknowledge that comScore's established practice of not licensing its patents "would suggest that comScore would seek a larger royalty," he attempts to neutralize that factor by asserting that "comScore would need to be concerned about the impact of making unreasonable royalty demands on Nielsen when it takes into account the potential of facing royalty demands from Nielsen for important Nielsen patents."  *Id.*  But Nielsen's "royalty demands" and its patents are neither admissible evidence in this case[3] nor relevant to *Georgia-Pacific* factors 1 and 4.

      2. ***Georgia-Pacific* Factors 3 & 7.**  Next, Mr. Reed discusses *Georgia-Pacific* factors 3 and 7.  Those factors are:

> (3)  The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

> (7)  The duration of the patent and the term of the license.

---

[3] *See* Plaintiff comScore, Inc.'s Motion *in Limine* No. 1.

*Georgia-Pacific Corp.*, 318 F. Supp. at 1120.  While Mr. Reed opines that a license between

comScore and Nielsen would be non-exclusive and acknowledges that both patents have "a long

remaining life," he offers no analysis as to whether these factors increase or decrease the royalty

amount.  *See* Reed Report, at 51–52.  Moreover, he attempts to inject a "cost savings" approach

into these factors by opining that the "parties would seek to structure the royalty payments to

reflect the value of the cost savings Nielsen would achieve over time."  *Id.*  But Mr. Reed's "cost

savings" is not relevant to the scope and term of the patent and he is "wrong as a matter of law to

claim that reasonable royalty damages are capped at the cost of implementing the cheapest

available, acceptable, noninfringing alternative."  *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d

1359, 1373 (Fed. Cir. 2008).

> 3. ***Georgia-Pacific* Factors 2, 12 & 13.**  Mr. Reed then combines *Georgia-Pacific* factors 2, 12, and 13.  Those factors are:

> > (2)  The rates paid by the licensee for the use of other patents comparable to the patent in suit.

> > (12)  The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

> > (13)  The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

*Georgia-Pacific Corp.*, 318 F. Supp. at 1120.  While Mr. Reed purports to discuss the customary

rates for patent licenses in the online measurement industry, he offers no analysis or evidence of

what customary rates prevail in the industry.  *See* Reed Report, at 52–54.  He offers no opinion

as to what rates are paid for patents comparable to the patent in suit (Factor 2).  He offers no

opinion as to what portion of the profit or selling price may be customarily apportioned for the

use of the invention or an analogous invention (Factor 12).  And Mr. Reed offers no opinion as to

16

what portion of Nielsen's realizable profit should be credited to the invention (Factor 13).

Rather, his entire analysis of these factors amounts to nothing more than criticism of Mr. Green's analysis. Such criticisms by themselves are not support for Mr. Reed's own opinion as to what constitutes a reasonable royalty.

4. ***Georgia-Pacific* Factors 8, 9, 10, and 11.** Mr. Reed also combines *Georgia-Pacific* factors 8, 9, 10, and 11. *See* Reed Report, at 55–59. Those factors are:

> (8) The established profitability of the product made under the patent; its commercial success; and its current popularity.
>
> (9) The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.
>
> (10) The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.
>
> (11) The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

*Georgia-Pacific Corp.*, 318 F. Supp. at 1120. Here, Mr. Reed focuses on what he perceives to be the "modest value of the patents-in-suit to Nielsen," his opinion that there "is no indication that use of [the technology] by Nielsen or comScore has had any significant impact on sales, trends, profitability, or market share," and his opinion that "Nielsen has at least two design around options." Reed Report, at 56–57. But Mr. Reed does not discuss the profitability of the Nielsen products made with the accused system (Factor 8), an important factor under *Georgia-Pacific*. Moreover, for the reasons stated *infra*, Mr. Reed's reliance on Nielsen's alleged "design around options" is wholly speculative.

5. ***Georgia-Pacific* Factors 5 & 6.**

Finally, Mr. Reed addresses commercial relationship and convoyed sales in two separate sections, the last of the *Georgia-Pacific* factors. *See* Reed Report, 54 & 56. Mr. Reed

17

acknowledges that the commercial relationship between Nielsen and comScore would "place upward pressure on the royalty rate," but then states that "cost savings" would limit this upward pressure.  Mr. Reed does not provide a final analysis as to how this factor would affect the determination of a reasonable royalty.  With respect to convoyed sales, Mr. Reed concludes that convoyed sales "would have no impact on the reasonable royalty determination."  Reed Report, at 59.  But his opinion here is only a criticism of Mr. Green's opinion, rather than reflecting his own independent analysis of the effect of convoyed sales on the appropriate royalty.

*      *      *

The mere use of the *Georgia-Pacific* factors as headings is not sufficient to meet the standards under Rule 702 and *Daubert*.  *Georgia-Pacific* is an established methodology for constructing a hypothetical negotiation, but in order for an expert's opinions to be admissible, they must be formed utilizing this framework in a meaningful way.  Mr. Reed's reports and testimony merely pay lip service to the *Georgia-Pacific* factors, and therefore must be excluded under Rule 702 and *Daubert*.

18

## CONCLUSION

For the foregoing reasons, plaintiff comScore respectfully requests that the Court grant comScore's motion to exclude Mr. Reed's opinions.

Respectfully submitted,

Date: November 7, 2011

By:   /s/ Courtney R. Forrest
Courtney R. Forrest (VSB No. 76738)
Richard L. Rainey (*pro hac vice*)
Kevin B. Collins (*pro hac vice*)
Brian Bieluch (*pro hac vice*)
Paul A. Ainsworth (*pro hac vice*)
Erica N. Andersen (VSB No. 76466)
Steven E. Robertson (VSB No. 78984)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
cforrest@cov.com
rrainey@cov.com
kcollins@cov.com
bbieluch@cov.com
painsworth@cov.com
eandersen@cov.com
srobertson@cov.com
Tel: (202) 662-6000
Fax: (202) 662-6291

K. Courtney Macdonald (VSB No. 77014)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
cmacdonald@cov.com
Tel:  (212) 841-1000
Fax:  (212) 841-1010

Stephen E. Noona (VSB No. 25367)
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
senoona@kaufcan.com
Tel: (757) 624-3239
Fax: (757) 624-3169

*Attorneys for Plaintiff comScore, Inc.*

19

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of November 2011, I will electronically file *Plaintiff comScore's Memorandum of Law in Support of Its Motion To Exclude Certain Opinions of Mr. Brett Reed, and Declaration of Courtney R. Forrest, with Exhibits A–R* with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Walter D. Kelley, Jr.
Tara Lynn R. Zurawski
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Tel:  (202) 879-3939
Fax: (202) 626-1700
Email: wdkelley@jonesday.com
        tzurawski@jonesday.com

*Counsel for Defendants The Nielsen Company (US), LLC and NetRatings, LLC.*


Dated: November 7, 2011

                        */s/ Courtney R. Forrest*
                        Courtney R. Forrest
                        Covington & Burling LLP
                        1201 Pennsylvania Avenue, NW
                        Washington, DC 20004-2401
                        cforrest@cov.com
                        Tel: (202) 662-5252
                        Fax: (202) 778-5252

                        *Counsel for Plaintiff comScore, Inc.*